**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **BASF AG,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 04 C 6969** |
| | ) | |
| **GREAT AMERICAN ASSURANCE** | ) | |
| **COMPANY, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION**

SAMUEL DER-YEGHIAYAN, District Judge

This matter is before the court on the parties' motions for summary judgment and on other related motions. For the reasons stated below we grant in part and deny in part the parties' motions.

## BACKGROUND

Boots Pharmaceuticals, Inc. ("Boots") was a pharmaceutical company that manufactured the drug known as Synthroid. Plaintiff BASF AG ("BASF") alleges that International Insurance Company ("International") issued three consecutive insurance policies to Boots from 1989 to 1992 ("Westchester Policies"), and that Defendant Westchester Fire Insurance Company ("Westchester") assumed the

obligations of the policies. BASF also alleges that Agricultural Insurance Company ("Agricultural"), the predecessor of Defendant Great American Assurance Company ("Great American"), issued an insurance policy to Boots for the period between April 1, 1992, and September 30, 1993 ("Great American Policy"). BASF also alleges that Defendant Federal Insurance Company ("Federal") issued two insurance policies to Boots for the period between September 30, 1993, and June 30, 1995 ("Federal Policies"). According to BASF, Boots had also purchased insurance policies ("Primary Policies") with separate primary insurers ("Primary Insurers") and the Westchester Policies, Great American Policy, and Federal Policies were additional umbrella policies. In 1995, Boots' parent company sold all shares in its United States subsidiaries, including Boots, to Knoll Pharmaceutical Company ("Knoll") and afterwards Boots was merged into Knoll and did not have a separate corporate existence.

BASF alleges that Knoll, as the successor to Boots, was sued in a nationwide class action complaint for alleged advertising campaigns and public statements that Boots made in scientific, regulatory, and medical communities between 1989 and 1995 ("Synthroid Litigation"). The plaintiffs in the Synthroid Litigation claimed that Boots had concealed medical information that showed that Synthroid was equivalent to other cheaper drugs and that Synthroid had bioequivalents. The plaintiffs in the Synthroid Litigation contended that Boots' misrepresentations caused them to purchase Synthroid rather than the cheaper bioequivalent drugs.

BASF claims that Knoll requested that the Primary Insurers defend Knoll in the Synthroid Litigation and that the Primary Insurers refused. BASF also claims that Knoll requested that Defendants defend Knoll in the Synthroid Litigation and Defendants refused. BASF claims that in 1997, Knoll ultimately paid tens of millions of dollars in defense costs and settled the matter for over $130 million. BASF claims that Knoll filed an action in federal court against the Primary Insurers and the federal district court ruled that the Primary Insurers breached their duty to defend and were estopped from disputing coverage ("Primary Insurers Action").

According to BASF, in March 2001, BASF, which is Knoll's parent company, sold Knoll, but the sales agreement provided that all rights to insurance claims relating to the Synthroid Litigation were retained by BASF. BASF brought the instant action and includes in its complaint a claim seeking a declaratory judgment stating that Defendants had a duty to defend and indemnify Knoll in the Synthroid Litigation (Count I), a breach of contract claim (Count II), and a claim seeking attorney's fees and costs pursuant to 215 ILCS 5/155 ("Section 5/155")(Count III). BASF has moved for summary judgment. Each of the Defendants has also individually moved for summary judgment. The parties have also filed a variety of miscellaneous motions relating to the motions for summary judgment.

## LEGAL STANDARD

Summary judgment is appropriate when the record, viewed in the light most

favorable to the non-moving party, reveals that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In seeking a grant of summary judgment, the moving party must identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). This initial burden may be satisfied by presenting specific evidence on a particular issue or by pointing out "an absence of evidence to support the non-moving party's case." *Id.* at 325. Once the movant has met this burden, the non-moving party cannot simply rest on the allegations in the pleadings, but, "by affidavits or as otherwise provided for in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). A "genuine issue" in the context of a motion for summary judgment is not simply a "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000). The court must consider the record as a whole, in a light most favorable to the non-moving party, and draw all reasonable inferences that favor the non-moving party. *Anderson*, 477 U.S. at 255; *Bay v. Cassens Transport Co.*, 212

F.3d 969, 972 (7th Cir. 2000). When there are cross motions for summary judgment, the court should "construe the evidence and all reasonable inferences in favor of the party against whom the motion under consideration is made." *Premcor USA, Inc. v. American Home Assurance Co.,* 400 F.3d 523, 526-27 (7th Cir. 2005).

## DISCUSSION

I. Miscellaneous Motions by the Parties

______The parties have filed a variety of tangential motions that relate to the parties' motions for summary judgment. BASF moved to bar and strike the reports and testimony of certain experts proposed by Defendants. On April 23, 2006, BASF's motion to bar and strike was dismissed without prejudice by agreement of the parties. Defendants have jointly moved to strike portions of BASF's statement of material facts. BASF has also, in turn, moved to strike Defendants' statements of material facts. Defendants jointly moved to strike certain portions of BASF's reply brief and a declaration filed in support of BASF's motion for summary judgment, and moved in the alternative for a sur-reply. Great American also subsequently moved to strike portions of BASF's reply brief contending that it included other new arguments and Great American requested in the alternative to state its objection to certain facts in the reply brief. We note that BASF also filed a motion to strike statements in Great American's reply brief that BASF deemed inaccurate and

unfounded, which motion we denied on April 27, 2006.

A. Defendants' Motion to Strike BASF's Statement of Material Facts

Defendants move to strike certain portions of BASF's statement of material facts. Defendants contend that BASF's statement of material facts contains legal arguments and paragraphs that are not concise as is required under Local Rule 56.1. We do not find that the paragraphs in BASF's statement of facts were such that the entire statement of facts should be stricken. We also note that statement of facts presented by Defendants themselves bear many of the aspects that Defendants complain about in their motion to strike. Therefore, we shall consider Defendants' arguments concerning specific portions of BASF's statement of material facts to determine whether specific paragraphs of BASF's statement of facts should be stricken.

Defendants argue that the court should strike BASF's statement of material fact paragraph number 6 ("Paragraph 6"), which states, in part, that certain rights were retained by BASF. We agree that such a statement is a legal argument and conclusion, and therefore we grant Defendants' motion to strike, in part, Paragraph 6. *See Malec v. Sanford*, 191 F.R.D. 581, 585 (N.D. Ill. 2000)(stating in addition that "[t]he purpose of the 56.1 statement is to identify for the Court the evidence supporting a party's factual assertions in an organized manner: it is not intended as a forum for factual or legal argument").

Defendants argue that the court should strike BASF's statement of material fact paragraph number 10 ("Paragraph 10"), which states that the London Agency became the Westchester Specialty Group. Defendants contend that Paragraph 10 is argumentative and improperly seeks to characterize the supporting testimony. We disagree. Paragraph 10 provides facts to which Defendants can respond, and does not contain improper argument. Therefore, we deny Defendants' motion to strike Paragraph 10.

Defendants argue that the court should strike BASF's statement of material fact paragraph number 13 ("Paragraph 13"), which addressed the duty to defend for the umbrella policies in certain situations. We agree with Defendants that such a statement is a legal argument, and therefore we grant Defendants' motion to strike Paragraph 13.

Defendants argue that the court should strike the portion of BASF's statement of material fact paragraph number 15 ("Paragraph 15"), which states "*See also* Ex. NN at 60:24-61:06." Defendants contend that the citation is an argumentative characterization of testimony. However, the citation itself does not contain any argument or statement about testimony. In addition, to the extent that BASF believes that the citation does not support the facts in Paragraph 15, the proper course under Local Rule 56.1 is to indicate the disagreement in Defendants' Local Rule 56.1 responses rather than move to strike the citation. Therefore, we deny Defendants' motion to strike any portion of Paragraph 15.

Defendants argue that the court should strike BASF's statement of material fact paragraph number 22 ("Paragraph 22"), which states that Agricultural had a duty to defend in certain situations. We agree that such a statement is a legal argument, and therefore we grant Defendants' motion to strike Paragraph 22.

Defendants argue that the court should strike BASF's statement of material fact paragraph number 26 ("Paragraph 26"), which states that the policy issued by Agricultural does not contain a provision prohibiting a transfer by operation of law. Defendants argue that such a statement is an argumentative characterization of the testimony. Again, if Defendants seek to challenge the supporting citation, a motion to strike is not the proper vehicle in which to do so. We conclude that Paragraph 26 includes a proper set of facts that complies with Local Rule 56.1 which could have been responded to by Defendants. Therefore, we deny Defendants' motion to strike Paragraph 26.

Defendants argue that the court should strike BASF's statement of material fact paragraph number 36 ("Paragraph 36"), which states what the legal obligations were for the Primary Insurers under the Primary Policies. We agree with Defendants that such a statement is a legal argument, and therefore we grant Defendants' motion to strike Paragraph 36.

Defendants argue that the court should strike BASF's statement of material fact paragraph number 37 ("Paragraph 37"), which states what the law is in regard to an insurer's duty to defend. We agree with Defendants that such a statement is a

legal argument, and therefore we grant Defendants' motion to strike Paragraph 37.

Defendants argue that the court should strike BASF's statement of material fact paragraph number 38 ("Paragraph 38"), which states, in part, that none of Knoll's primary insurers stepped forward to assist Knoll in the Synthroid Litigation, that they recognized that ambiguities existed in the Primary Policies, and that they collectively rejected Knoll's request for assistance. Defendants argue that Paragraph 38 contains legal conclusions. We conclude that Paragraph 38 complies with Local Rule 56.1 and we deny Defendants' motion to strike Paragraph 38.

Defendants argue that the court should strike BASF's statement of material fact paragraph number 39 ("Paragraph 39"), which states that Knoll filed an action against the Primary Insurers and states what the court's ultimate holding was in the action. We conclude that Paragraph 39 complies with Local Rule 56.1 and we deny Defendants' motion to strike Paragraph 39.

Defendants argue that the court should strike BASF's statement of material fact paragraph number 41 ("Paragraph 41"), which states the amount of damages owed to BASF in light of the settlement amount and the payments by the Primary Insurers. We conclude that Paragraph 41 complies with Local Rule 56.1. Defendants could either have admitted or denied the figures presented by BASF and provided support for any denial. Therefore, we deny Defendants' motion to strike Paragraph 41.

Defendants argue that the court should strike BASF's statement of material

fact paragraph number 52 (“Paragraph 52"), which states that the settlement funds remained deposited while the parties engaged in extensive negotiations and discovery. We conclude that Paragraph 52 complies with Local Rule 56.1 and we deny Defendants’ motion to strike Paragraph 52.

Defendants argue that the court should strike BASF’s statement of material fact paragraph number 53 (“Paragraph 53"), which explains how the settlement proceedings progressed and the parties’ beliefs during the proceedings. We conclude that Paragraph 53 complies with Local Rule 56.1 and we deny Defendants’ motion to strike Paragraph 53.

Defendants argue that the court should strike BASF’s statement of material fact paragraph number 55 (“Paragraph 55"), which indicates what the court in the Synthroid Litigation stated. We conclude that Paragraph 55 complies with Local Rule 56.1 and we deny Defendants’ motion to strike Paragraph 55.

Defendants argue that the court should strike BASF’s statement of material fact paragraph number 57 (“Paragraph 57"), which states that Knoll devoted significant time and resources to defending itself in the Synthroid Litigation. We conclude that Paragraph 57 complies with Local Rule 56.1 and we deny Defendants’ motion to strike Paragraph 57.

Defendants argue that the court should strike BASF’s statement of material fact paragraph number 58 (“Paragraph 58"), which states that Knoll’s counsel in the Synthroid Litigation provided “specialized talents” in the defense and that its

counsel implemented "an integrated defense strategy that was both effective and cost-efficient." (BSF 38). We agree with Defendants that such a statement is argumentative, and therefore we grant Defendants' motion to strike Paragraph 58.

Defendants argue that the court should strike BASF's statement of material fact paragraph number 61("Paragraph 61"), which states an approximate amount that Knoll spent in the Synthroid Litigation defense and explains why BASF's name appeared on some defense invoices. We conclude that Paragraph 61 complies with Local Rule 56.1 and we deny Defendants' motion to strike Paragraph 61.

Defendants argue that the court should strike BASF's statement of material fact paragraph numbers 63 ("Paragraph 63"), 64 ("Paragraph 64"), and 65 ("Paragraph 65"), which state what the Master Consumer Class Action Complaint ("MCC") indicated in the Synthroid Litigation. If Defendants disagreed with the assertions, they could have indicated their disagreement in their Local Rule 56.1 response. We conclude that Paragraphs 63, 64, and 65 comply with Local Rule 56.1 and we deny Defendants' motion to strike the paragraphs.

Defendants argue that the court should strike BASF's statement of material fact paragraph numbers 66 ("Paragraph 66"), 67 ("Paragraph 67"), 69 ("Paragraph 69"), and 70 ("Paragraph 70"), which state what the Master Third-Party Payor Class Action ("MTPPC") indicated in the Synthroid Litigation. If Defendants disagreed with the assertions, they could have indicated their disagreement in their Local Rule 56.1 response. We conclude that Paragraph 66, 67, 69, and 70 comply with Local Rule 56.1 and we deny Defendants' motion to strike the paragraphs.

Defendants argue that the court should strike BASF's statement of material fact paragraph number 71("Paragraph 71"), which states what the payors indicated. We conclude that Paragraph 71 complies with Local Rule 56.1 and we deny Defendants' motion to strike Paragraph 71.

Defendants argue that the court should strike BASF's statement of material fact paragraph number 73 ("Paragraph 73"), which provides facts concerning matters such as the mailing of certain letters and statements made by certain individuals. We conclude that Paragraph 73 complies with Local Rule 56.1 and we deny Defendants' motion to strike Paragraph 73.

Defendants argue that the court should strike BASF's statement of material fact paragraph number 75 ("Paragraph 75"), which states that a notice letter was mailed to the proper person for notifying Westchester and that the letter was forwarded by that person. We conclude that Paragraph 75 complies with Local Rule 56.1 and we deny Defendants' motion to strike Paragraph 75.

Defendants argue that the court should strike BASF statement of material fact paragraph number 77 ("Paragraph 77"), which states that Westchester Specialty Group ("WSG") did not request materials from a meeting held by Knoll regarding the Synthroid Litigation or contact Knoll to learn about the meeting. We conclude that Paragraph 77 complies with Local Rule 56.1 and we deny Defendants' motion to strike Paragraph 77.

Defendants argue that the court should strike BASF's statement of material fact paragraph number 81 ("Paragraph 81"), which states what WSG included and

did not include in its denial letter. We conclude that Paragraph 81 complies with Local Rule 56.1 and we deny Defendants' motion to strike Paragraph 81.

Defendants argue that the court should strike BASF's statement of material fact paragraph number 87 ("Paragraph 87"), which states that Agricultural failed to provide a definitive denial of coverage to Knoll. We conclude that Paragraph 87 complies with Local Rule 56.1 and we deny Defendants' motion to strike Paragraph 87.

Defendants argue that the court should strike BASF's statement of material fact paragraph number 89 ("Paragraph 89"), which states that to this day Agricultural has not taken a definitive position as to coverage and still refuses to provide coverage. We conclude that Paragraph 89 complies with Local Rule 56.1 and we deny Defendants' motion to strike Paragraph 89.

Defendants argue that the court should strike BASF's statement of material fact paragraph number 98 ("Paragraph 98"), which refers to a policy form not at issue in the instant action that BASF contends shows that the Defendants knew how to exclude coverage if they desired to do so. We agree with Defendants that such a statement does not involve material facts and is argumentative, and therefore we grant Defendants' motion to strike Paragraph 98.

In summation, we grant in part and deny in part Defendants' motion to strike BASF's statement of material facts and strike the following paragraphs of BASF's statement of material facts: 6, 13, 22, 36, 37, 58, and 98.

B. BASF's Motion to Strike Defendants' Statement of Facts

BASF moves to strike Defendants' statement of facts. However, BASF provides only general arguments concerning the substance of Defendants' statements of material facts and BASF fails to provide arguments concerning specific paragraphs of facts. Therefore, we deny BASF's motion to strike Defendants' statements of material facts.

C. Defendants' Motions to Strike Portions of BASF's Reply Brief

Defendants have filed two motions to strike portions of BASF's reply brief in support of BASF's motion for summary judgment. In Defendants' joint motion to strike, Defendants contend that BASF introduced fifteen separate groups of facts that were not addressed in BASF's memorandum in support of its motion for summary judgment. We do not agree that BASF improperly introduced new information. BASF is entitled to respond in its reply brief to Defendants' counter-arguments. Also, we have reviewed all the facts pointed to by Defendants in their motion to strike and, even if we were to strike the facts, such a ruling would have no effect on the court's ruling on the motions for summary judgment that follows. Therefore, we deny Defendants' joint motion to strike portions of BASF's reply brief and deny Defendants' request for leave to file a sur-reply.

Great American has also filed a separate motion to strike portions of BASF's reply brief. Great American contends that BASF included certain other new evidence in its reply brief that it did not include in its memorandum in support of its

motion for summary judgment. However, regardless of whether the evidence pointed to by Great American was new, Great American has provided its objection to the evidence to the court and has voiced its position on the evidence. We also note that, even if we were to strike the evidence and accompanying factual assertions, such a ruling would have no effect on the court's ruling that follows. Therefore, we deny Great American's motion to strike portions of BASF's reply brief as moot and deny Great American's motion for leave to file a sur-reply.

II. Choice of Law

When a federal court has diversity subject matter jurisdiction in a case and does not have federal question subject matter jurisdiction, the court must apply "the choice-of-law rules of the forum state . . . ." *Smurfit Newsprint Corp. v. Southeast Paper Mfg.*, 368 F.3d 944, 949 (7th Cir. 2004). The parties concede that this court solely has diversity subject matter jurisdiction and that the instant action was brought in federal court in Illinois. Therefore, we must look to Illinois state law for choice of law principles. Under Illinois law, in a case based upon an insurance contract, "[a]bsent an express choice of law, insurance policy provisions are generally 'governed by the location of the subject matter, the place of delivery of the contract, the domicile of the insured or of the insurer, the place of the last act to give rise to a valid contract, the place of performance, or other place bearing a rational relationship to the general contract.'" *Lapham-Hickey Steel Corp. v. Protection Mut. Ins. Co.*, 655 N.E.2d 842, 845 (Ill. 1995)(quoting in part *Hofeld v. Nationwide*

*Life Insurance Co.*, 322 N.E.2d 454 (Ill. 1975)). The parties agree that Boots' principal place of business was Illinois, that some of the policies involved in this action were issued in Illinois, and that the settlement agreement in the Synthroid Litigation provided that Illinois law governed the agreement. All the parties also concede that Illinois law applies in this action and accordingly we agree that Illinois law governs in this matter. ( D's R SF Par. 3, 9, 52)(B SJ 6-7)(W SJ 2)(G SJ 1)(F SJ 1).

III. Breach of Contract and Indemnity Claims Against Westchester

BASF argues that Westchester was obligated to provide coverage to Knoll under the Westchester Policies. BASF contends that since Westchester neither sought a judicial determination concerning its duty to defend Knoll nor provided a defense to Knoll, Westchester is estopped from disputing coverage under the Westchester Policies. BASF also contends that Westchester was obligated to provide Knoll with a defense in the Synthroid Litigation under four separate provisions of the Westchester Policies.

Westchester argues that coverage for Knoll was precluded under certain exclusions and conditions of the Westchester Policies. Westchester also argues that BASF lacks standing in the instant action and that the instant action is based upon conduct that occurred outside the Westchester Policies' coverage periods. Finally, Westchester argues that the court should perform an allocation of the settlement in the Synthroid Litigation and argues that Westchester has no duty to indemnify

BASF.

A. Whether Westchester is Estopped From Disputing Coverage

BASF argues that if Westchester believed that Knoll's defense in the Synthroid Litigation was not covered by the Westchester Policies, then Westchester was obligated to either seek a judicial declaration of non-coverage or defend Knoll under a reservation of rights. BASF contends that Westchester did neither and that it is now estopped from disputing coverage. An insurer's duty to defend an insured is triggered "when, based on the pleadings, there is a claim that is potentially covered by the insurance agreement." *Waste Management, Inc. v. International Surplus Lines Ins. Co.*, 579 N.E.2d 322, 333 (Ill. 1991); *Employers Ins. of Wausau v. Ehlco Liquidating Trust*, 708 N.E.2d 1122, 1134 (Ill. 1999)(citing *Waste Management, Inc.*, 579 N.E.2d at 333)). An insurer that refuses to defend an insured in a matter that is potentially covered by the policy "may not simply refuse to defend the insured" and take no other action. *Id.* The insurer is required to either "defend the suit under a reservation of rights or seek a declaratory judgment that there is no coverage" and "[i]f the insurer fails to do this, and is subsequently found to have wrongfully denied coverage, it is estopped from later raising policy defenses to coverage." *Id.* As is explained in detail below, BASF has pointed to sufficient undisputed facts that clearly show that Westchester breached its obligation to provide coverage to Knoll and to offer a defense for Knoll in the Synthroid Litigation.

The estoppel of the insurer "arises at the moment the insurance company wrongfully refuses to defend." *Maneikis v. St. Paul Ins. Co. of Ill.*, 655 F.2d 818, 822 (7th Cir. 1981). Westchester admits pursuant to Local Rule 56.1 that it refused to provide coverage to Knoll in denial letters sent to Knoll in October 1997 and April 1998. (WR BSF Par. 81). Thus, Westchester had an obligation at that time to not simply rest upon its denial, but to either provide coverage to Knoll under a reservation of rights or to file a declaratory judgment action. Westchester has not pointed to any evidence that contradicts the evidence presented by BASF showing that Westchester took neither of the required actions. Therefore, the undisputed evidence shows that Westchester is estopped from arguing at this juncture that it owed no coverage to Knoll.

B. Coverage Under Terms of the Westchester Policies

______BASF argues that Knoll's defense in the Synthroid Litigation was covered because: 1) the litigation involved a personal injury and an advertising injury, 2) Boots' had a "claim" prior to start of the Synthroid Litigation, 3) the Primary Insurers improper refused to provide coverage, and 4) the Primary Policies were exhausted. Westchester argues that coverage was excluded under certain conditions and exclusions in the Westchester Policies.

Under Illinois law, in order to determine whether an insurer has a duty to defend, the "allegations in the underlying complaint" should be compared "to the relevant provisions of the insurance policy." *LaGrange Memorial Hosp. v. St. Paul*

*Ins. Co.*, 740 N.E.2d 21, 26-27 (Ill. App. Ct. 2000)(citing *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 607 N.E.2d 1204, 1212 (Ill. 1992)). An insurer has a duty to defend under a policy if the allegations that are included in the underlying complaint: 1) "fall within" the provisions of the insurance policy, or 2) are "potentially within, the policy's coverage . . . ." *Outboard Marine Corp.*, 607 N.E.2d at 1212(stating that a "[r]efusal to defend is unjustifiable unless it is clear from the face of the underlying complaint that the facts alleged do not fall potentially within the policy's coverage"); *Central Mut. Ins. Co. v. Useong Intern., Ltd.*, 394 F.Supp.2d 1043, 1048 (N.D. Ill. 2005)(stating that in determining whether an insured breached its duty to defend, the court should inquire "whether that conduct as alleged in the complaint is at least arguably within one or more of the categories of wrongdoing that the policy covers").

The construction of the provisions of an insurance policy is a question of law. *Sokol and Co. v. Atlantic Mut. Ins. Co.,* 430 F.3d 417, 420 (7th Cir. 2005). When construing the provisions of a policy, a court must consider: 1) "the intent of the parties to the contract," 2) "construe the policy as a whole," 3) and "with due regard to the risk undertaken, the subject matter that is insured and the purposes of the entire contract." *Outboard Marine Corp.*, 607 N.E.2d at 1212; *Sokol and Co.,* 430 F.3d at 420; *Geschke v. Air Force Ass'n,* 425 F.3d 337, 342 (7th Cir. 2005)(stating that "[i]n Illinois, an insurance policy is treated as any other contract and is subject to the same rules of construction"). Words in the policy that are unambiguous should be given their "plain, ordinary, and popular meaning." *Outboard Marine*

*Corp.*, 607 N.E.2d at 1212; *Sokol and Co.,* 430 F.3d at 420; *Geschke,* 425 F.3d at 342. If a word in the policy could be reasonably afforded "more than one reasonable interpretation," the word is ambiguous and should "be construed in favor of the insured and against the insurer who drafted the policy." *Outboard Marine Corp.*, 607 N.E.2d at 1212; *Sokol and Co.,* 430 F.3d at 420; *Geschke,* 425 F.3d at 342 (quoting *Allstate Ins. Co. v. Smiley*, 659 N.E.2d 1345, 1350 (Ill. 1995) for proposition that "a court should not search for an ambiguity where there is none" and that "[t]he determination of whether the terms of an insurance policy are ambiguous is made by reference to a reasonable person standard," which means "what a reasonable person in the position of the insured would understand [the terms] to mean"); *Premcor USA, Inc.*, 400 F.3d at 526(quoting *Transamerica Ins. Co. v. South,* 975 F.2d 321, 327 (7th Cir. 1992) for the proposition that "[a]ll the provisions of the insurance contract, rather than an isolated part, should be read together to interpret it and to determine whether an ambiguity exists").

1. Personal Injury and Advertising Injury

BASF argues that the Synthroid Litigation was covered because it involved a "personal injury" and an "advertising injury." Westchester admits pursuant to Local Rule 56.1 that the "Coverage A" sections of Westchester Policies issued from 1989 to 1990 and 1990 to 1991 ("1989-1990 and 1990-1991 Westchester Policies"), provide coverage for damages arising out of an "occurrence," which is defined to include an "offense that results in [a] 'Personal Injury' and an act that results in an

"Advertising Injury." ( WR BSF Par. 16). Westchester also admits that all of the Westchester Policies defined the term "Personal Injury" to include an "injury, other than 'bodily injury,' arising out of . . . (4) Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services . . . ." ( WR BSF Par. 17). In addition, Westchester admits that the 1989-1990 and 1990-1991 Westchester Policies defined the term "Advertising Injury" to include an "injury arising out of . . . (1) Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services . . . ." ( WR BSF Par. 18). Finally, Westchester admits that the Westchester Policy issued from 1991 to 1992 ("1991-1992 Westchester Policy") stated that the term "Advertising Injury" "means injury that arises out of your advertising activities as a result of (1) oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services . . . ." ( WR BSF Par. 18).

Westchester argues that the claims at issue in the Synthroid Litigation did not involve a "personal injury" or an "advertising injury" because the plaintiffs in the Synthroid Litigation did not bring libel or defamation claims. The plaintiffs in the Synthroid Litigation brought claims against Knoll alleging that Knoll's and Boots' misrepresentations concerning Synthroid and the obstruction of the publication of a study compiled by Dr. Betty Dong ("Dong") violated the "Sherman Antitrust Act, 15 U.S.C. § 2 *et seq.,* the Federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.*, . . . [violated] various state consumer protection statutes

including the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.*, . . . and the common law." *In re Synthroid Marketing Litigation*, 188 F.R.D. 295, 298 (N.D. Ill. 1999). The Primary Insurance Policies contained coverage for a "personal injury" and "advertising injury" similar to the policies at issue in the instant action. The court in the Primary Insurer Action concluded that the Synthroid Litigation did fall within the coverage provided for a "personal injury" and "advertising injury." *Knoll Pharm. Co. v. Automobile Ins. Co. of Hartford*, 152 F.Supp.2d 1026, 1034-39 (N.D. Ill. 2001). We agree with the reasoning provided by the court in the Primary Insurers Action. Although Westchester argues that the plaintiffs in the Synthroid Litigation did not bring defamation or libel claims, similar to the Primary Policies, none of the Westchester Policies limit coverage to a particular cause of action such as libel or defamation. *Id.* The Westchester Policies instead cover certain types of conduct that "slanders or libels a person or organization or disparages a person's or organization's goods, products or services . . . ." ( WR BSF Par. 17). While the words "slanders" and "libels" do contain the words "slander" and libel," which are specific causes of action, to the extent that the words "slanders" and "libels" are ambiguous, the provisions must be interpreted in favor of BASF as the successor to the insured. *Outboard Marine Corp.*, 607 N.E.2d at 1212; *Employers Ins. of Wausau v. Ehlco Liquidating Trust*, 708 N.E.2d 1122, 1130 (Ill. 1999)(stating that if a provision of an insurance policy is ambiguous, a "court must construe the policy in favor of the insured and against the insurer that drafted the policy"). Under such a construction, it is only reasonable to conclude, as

the court did in the Primary Insurer's action, that the Westchester Policies providing coverage for a "personal injury" or "advertising injury" provided coverage that would extend to the provision of a defense in suits where injuries to plaintiffs "may have [had] their origin in slander, libel, or disparagement . . . ." *Knoll Pharm. Co.*, 152 F.Supp.2d at 1035. There is also no provision in the Westchester Policies that limits coverage to actions in which the insured itself directly slandered, libeled, or disparaged the plaintiffs in the action. If Westchester desired to limit coverage to a defense in cases when the plaintiffs themselves were harmed by the libelous, defamatory or disparaging statements of Boots or its successors and plaintiffs were specifically bringing libel or defamation claims, then Westchester could have provided such specificity in the Westchester Policies. However, no such provisions were included in the Westchester Policies.

Westchester also argues that certain language in the Westchester Policies indicates that the insured must have caused the harm to the plaintiffs through disparaging statements and that this causation aspect of the Westchester Policies was not present in the Synthroid Litigation. Westchester argues that, similar to the Primary Policies, under the Westchester Policies, the "insured becomes legally obligated to pay damages because of the 'personal injury' or 'advertising injury' to which this coverage part applies." ( W Ans. BSJ 5). However, Westchester mischaracterizes the language of the Westchester Policies. The policies do not exclusively provide coverage in actions in which the plaintiffs' harm is caused by an improper statement. Westchester omits key language in the 1989-1990 and 1990-

1991 Westchester Policies indicating that the policies cover an "advertising injury" and "personal injury" "arising out of" such improper statements. (WR BSF Par. 17-18). Thus, the language in the policies indicates that the key inquiry is whether an action grows from such improper statements. Westchester is improperly seeking to impose a causation requirement between the insured's conduct and the improper statements that is not included in the terms of the Westchester Policies.

Westchester admits that the Synthroid Litigation grew out of various disparaging, defamatory, and libelous statements. Westchester admits that on April 25, 1996, the Wall Street Journal published a front page article, which stated that Boots had refused to allow Dong to publish a study ("Dong Study") that showed that "Synthroid and three cheaper drugs were essentially interchangeable." ( WR BSF Par. 42). Such a statement was a negative statement about Boots and thus about its successor Knoll. Such a statement was also a negative statement about the Synthroid product because it gave the impression that the Synthroid product was not superior to other cheaper products. Westchester admits that shortly after the article was published, various lawsuits were brought against Knoll that related to the refusal to publish the Dong Study. ( WR BSF Par. 43, 49). Westchester also admits that a significant number "of new lawsuits followed the publication of the Dong study" and that there were soon numerous class action complaints pending in seventeen different federal courts. ( WR BSF Par. 49). In addition, the class action complaint in the Synthroid Litigation alleged that public statements and advertising by Boots inaccurately indicated that Synthroid was more effective than other drugs and that

Synthroid had no bioequivalents. (B Ex. Z Par. 2). The plaintiffs in the Synthroid Litigation also alleged that in 1990, 1991, 1993, and 1995, Boots unjustly criticized the Dong Study and attempted to discredit the Dong Study. (WR BSF Par. 65)(B Ex. Z Par. 3). Such allegations involve alleged disparaging statements by Boots against Dong and her study. Westchester also admits pursuant to Local Rule 56.1 that in April 1997 an editorial was published in the Journal of the American Medical Association which discussed Knoll's unjustifiable disparagement of the Dong Study. ( WR BSF Par. 47). Such allegations were criticisms of Knoll's treatment of the Dong Study and involved both the disparaging statements made about the Dong Study by Knoll and statements that disparaged Knoll for criticizing the Dong Study.

Westchester also admits that a MCC and the MTPPC filed in the Synthroid Litigation also indicate that the Synthroid Litigation grew out of defamatory, libelous, or disparaging statements. For example, Westchester admits pursuant to Local Rule 56.1 that the MCC listed the factual bases for the source of damages and mentioned topics such as whether "Defendants have disparage[d] the goods, services, and/or business of the makers of" the bioequivalent drugs. ( WR BSF Par. 64). Westchester also admits that the MCC, in discussing the bases for damages, referred to letters sent by Boots to Dong "complaining about the study's procedures and methods" and Boots' development of objections to the "study's procedures and methods." ( WR BSF Par. 65). Westchester also admits that the MTPPC, in discussing the bases for damages, mentioned that Boots inaccurately stated in advertising that there was no bioequivalent to Synthroid, engaged in "false

advertising," and hired researchers and consultants to provide "Boots with the criticisms it sought" against the Dong Study. ( WR BSF Par. 66).

Westchester argues that BASF's interpretation of the Westchester Policies is too broad because, under the interpretation, "damages with 'any connection at all' to defamation or disparagement are covered." (W Ans. BSJ 6). However, Westchester does not accurately characterize BASF's interpretation and no such extreme interpretation is required to conclude that the Synthroid Litigation grew out of "personal injury" or "advertising injury." In the Synthroid Litigation, the disparaging, defamatory, and libelous statements were not an incidental piece of evidence. Rather, the undisputed evidence presented by BASF shows that the Synthroid Litigation itself grew out of those statements.

Westchester also argues that there "was no defamation or disparagement (of anyone)." ( WAns. BSJ 7). However, as is explained above, Westchester admits, for example, to the contents of the Wall Street Journal article. The statement in the article that indicated that Boots was attempting to conceal medical information was unquestionably a statement that disparaged the reputation of Boots. Likewise, the statement that indicated that there was evidence that Synthroid had cheaper equivalents unquestionably reflected negatively on Synthroid because Synthroid was selling at a higher price than the other referenced equivalents. Westchester also admits that the plaintiffs in the Synthroid Litigation attempted to unjustly criticize and discredit the Dong Study. Such statements also disparaged the Dong Study and inevitably disparaged Dong's reputation as the author of that study.

Westchester also argues that for a "personal injury" or "advertising injury"to occur, the improper statements must be "legally defamatory." ( W Ans. BSJ 7). However, there is no provision in the Westchester Policies that limits coverage to statements that are legally sufficient to support a defamation claim in court. Thus, it is clear, based on the undisputed evidence that the Synthroid Litigation involved a "personal injury" and an "advertising injury." (WR BSF 17-18). Accordingly, based on the undisputed evidence, no reasonable trier of fact could conclude other than that Westchester owed Knoll a duty to defend Knoll in the Synthroid Litigation because the litigation arose out of what could reasonably be deemed disparaging, defamatory, and libelous statements.

2. Failure of Primary Insurers to Provide Coverage

BASF argues that Westchester was required to defend Knoll in the Synthroid Litigation because the Primary Insurers unlawfully refused to provide a defense to Knoll. Westchester admits pursuant to Local Rule 56.1 that the 1989-1990 and 1990-1991 Westchester Policies provided coverage where a suit against the insured was "not covered as warranted" by the Primary Policies. ( WR BSF Par. 14). Thus, Westchester promised Boots and Knoll that Westchester would step in and defend the insured if the Primary Insurers did not do so. Westchester admits pursuant to Local Rule 56.1 that when the Synthroid Litigation began, Knoll asked the Primary Insurers to provide a defense for Knoll and that the Primary Insurers universally refused. ( WR BSF Par. 38). Westchester also admits that in July 2001, the court in

the Primary Insurers Action held that the Primary Insurers had a duty to defend Knoll in the Synthroid Litigation and had wrongfully refused coverage. ( WR BSF Par. 39).

a. Coverage A and Coverage B Sections

Westchester argues that the 1989-1990 and 1990-1991 Westchester Policies provided coverage where the Primary Insurers failed to provide coverage as warranted only in the Coverage B Section of the policies ("Coverage B Section") . Westchester argues that the Coverage A Section ("Coverage A Section") of the policies is applicable instead. ( W Ans. BSJ 2). Westchester argues that the Coverage B Section does not apply in the instant action because that section only applies when the Primary Insurance Policies do not apply. Westchester argues that since the court in Primary Insurer Action found that the Primary Insurance Policies owed coverage to Knoll, the Coverage B Section does not apply in the instant action. The Coverage B Section provides that it applies to coverage "with respect to any loss covered by the terms and conditions of [the] policy, but not covered as warranted by the underlying policies . . . ." (BSJ Ex. H). Westchester is correct that in the Primary Insurer Action, the court found that the Primary Insurers should have provided Knoll a defense. However, such a fact merely shows that the Coverage B Section is applicable because the court's finding shows that the Primary Insurers wrongfully denied coverage to Knoll and that Knoll suffered losses that were "not covered as warranted by the underlying policies." (BSJ Ex. H). Thus, BASF

correctly argues that the Coverage B Section is applicable in this action. BASF also correctly points out that the duty to defend provision in the 1989-1990 and 1990-1991 Westchester Policies is separate from the coverage provisions and thus, for the purposes of the duty to defend, it applies to both the Coverage A Section and the Coverage B Section. BASF also correctly points out that there is nothing in the Westchester Policies that would prevent a finding that both the Coverage A Section and the Coverage B Section were applicable to the Synthroid Litigation. Thus under the 1989-1990 and 1990-1991 Westchester Policies Westchester, was obligated under the Coverage B Section to provide coverage to Knoll in the Synthroid Litigation.

b. Notice Given to Westchester

Westchester also argues that even if the Coverage B Section is applicable in the instant action, Westchester owed no duty to defend Knoll because Knoll never advised Westchester that the Primary Insurers refused to defend Knoll in the Synthroid Litigation.

In the instant action, Westchester admits pursuant to Local Rule 56.1 that in June 1997, Knoll sent a letter ("Letter") to Thomas Deberry ("Deberry") of Crum & Forester Insurance Claims ("Crum") to invite International to a meeting to discuss the Synthroid Litigation. ( WR BSF Par. 75). Westchester also admits that Crum owned International, which issued the Westchester Policies. (WR BSF Par. 10-11).

BASF also contends that Deberry forwarded the Letter to WSG, which handled claims for International, and that Nancy McCollum ("McCollum"), who works for WSG, was aware of the Synthroid Litigation by June 1997. (BSF Par. 75). Westchester denies those facts and claims that BASF's contention is not supported by evidence. Westchester argues that Deberry was not the correct person to notify and that he did not forward the notice of the meeting to McCollum. However, McCollum herself testified that she became aware of the Synthroid Litigation when she received the notice from Crum in June 1997. (Mcm. Dep. 13-14). Also, although Westchester in its response to BASF's statement of material facts disputes that it received the notice on June 24, 1997, Westchester in its memorandum in support of its motion for summary judgment admits that Westchester received notice "on or about June 24 or June 25, 1997." (WSJ 3). In addition, although Westchester now complains that it was not given a timely notice of the Synthroid Litigation and the positions of the Primary Insurers, Westchester admits that the denial of coverage letter that was sent to Knoll by Westchester does not contain any mention of the untimely notice as a basis for the denial. (WR BSF Par. 81). Thus, based on the above, BASF is not estopped from asserting that the Primary Insurers failed to provide a defense for Knoll in the Synthroid Litigation. ( WR BSF Par. 38). Therefore, based on the above, we conclude that the undisputed evidence clearly shows that Westchester was obligated to defend Knoll in the Synthroid Litigation because the Primary Insurers failed to defend Knoll as warranted in the Primary Policies.

3. Coverage of "Claim"

BASF argues that since the 1991-1992 Westchester Policy stated that it covered both a "claim" or "suit," the Westchester's coverage obligations were triggered even before a suit had begun in the Synthroid Litigation. Westchester admits pursuant to Local Rule 56.1 that the 1991-1992 Westchester Policy contained the following language:

> 15. The 1991-1992 International Policy has the duty to defend both claims and suits where the underlying Primary policies do not apply or are exhausted:
>
> We shall have the right and duty to defend any 'Claim' or 'Suit' seeking damages covered by the terms and conditions of this policy when:
> (a) the applicable limits of insurance of the underlying insurance policies set forth in schedule A and to be maintained by you in accordance with condition M of this policy ('the 'Underlying Insurance'), plus the applicable limits of other insurance have been exhausted by payments; or
> (b) Damages are sought for 'Bodily Injury,' 'Property Damage,' 'Personal Injury,' or 'Advertising Injury' which are not covered by 'Underlying Insurance' or other insurance.

( WR BSF Par. 15)(emphasis added). Thus, Westchester was obligated under the 1991-1992 Westchester Policy to offer assistance to Knoll prior to the beginning of the Synthroid Litigation, when the prospective plaintiffs were seeking payment because the plaintiffs would have had claims prior to the filing of suits. Therefore, Westchester also owed coverage under the above section of the 1991-1992 Westchester Policy.

4. Exhaustion of Primary Policies

______BASF argues that the Westchester Policies provided that Westchester would defend Knoll when the Primary Policies were exhausted. ( WR BSF Par. 13). Westchester admits pursuant to Local Rule 56.1 that the 1989-1990 and 1990-1991 Westchester Policies provided that coverage "applies only where" the policies are "in excess of the underlying policies, and other insurance does not exist." ( WR BSF Par. 13). Westchester also admits that the 1989-1990 and 1990-1991 Westchester Policies provided that Westchester would defend the insured in any suit covered by the policies seeking damages and that if the primary insurance was exhausted, that Westchester would "take charge of the settlement or defense of any claim or proceeding" against the insured "from the same occurrence." ( WR BSF Par. 13). Finally, Westchester admits that the 1991-1992 Westchester Policy provides that Westchester had "the right and duty to defend . . . when . . . the applicable limits of other insurance have been exhausted by payments . . . ." ( WR BSF Par. 15).

Westchester argues that the Primary Policies were not exhausted until the Synthroid Litigation was settled and that, therefore, Westchester's duty to defend would have been triggered at the earliest when the Synthroid Litigation was settled. However, Westchester admits pursuant to Local Rule 56.1 that Knoll paid out amounts above the Primary Policy limits under the preliminary approved settlement and thus Westchester's duty to defend was triggered, at the latest, at that point. There is no requirement included in the Westchester Policies that the Primary Insurers pay out the funds to trigger the exhaustion requirement and, to the extent that the above provisions are ambiguous, they must be interpreted in favor of BASF.

*Outboard Marine Corp.*, 607 N.E.2d at 1212; *Employers Ins. of Wausau v. Ehlco Liquidating Trust*, 708 N.E.2d 1122, 1130 (Ill. 1999)(stating that if a provision of an insurance policy is ambiguous, a "court must construe the policy in favor of the insured and against the insurer that drafted the policy").

The instant action is similar to *Elas v. State Farm Mut. Auto. Ins. Co.*, 352 N.E.2d 60 (Ill. App. Ct. 1976). In *Elas*, the defendant insurer was an excess insurer that refused to defend an insured. *Id.* at 62-5. The insured paid out amounts in a preliminary settlement and ultimately had a judgment entered that exceeded the limits of the primary insurance policies. *Id.* The court in *Elas* concluded that once it was clear that the primary insurance limits were reached, "any further recovery would be sought against [the defendant insurer] as the excess insurer." *Id.* at 63. Similarly, in the instant action, when the payments by Knoll exceeded the Primary Policy limits, Westchester, as the excess insurer, was obligated to provide coverage.

Westchester also argues vaguely that BASF has not provided evidence showing that the Primary Policies were exhausted. We disagree. BASF has pointed to sufficient evidence that the Primary Policy amounts were exhausted and Westchester has not pointed to any evidence that would indicate otherwise. (BSF Par. 36, 56). Therefore, we conclude that Westchester owed Knoll a duty to defend Knoll under the above provisions of the Westchester Policies relating to the exhaustion of the Primary Policies.

We also reiterate that in finding that there is sufficient evidence that shows that Westchester owed coverage under the above four provisions of the Westchester

Policies, BASF is not required to show that the Synthroid Litigation was in fact covered by the Westchester Policies to show a breach of a duty to defend. Westchester owed Knoll a duty to defend even if there potentially was coverage and Westchester only could refuse coverage if it was “clear from the face of the underlying complaint that the facts alleged” in the Synthroid Litigation did “not fall potentially within the policy's coverage.” *Outboard Marine Corp.*, 607 N.E.2d at 1212. The undisputed evidence in this case shows that a reasonable trier of fact could not conclude other than that BASF has clearly met such a burden in showing that Westchester breached its duty to defend Knoll.

5. Exclusion O

Westchester points to Exclusion O of the 1989-1990 and 1990-1991 Westchester Policies (“Exclusion O”), which stated that the policies would not apply to “[a]ny defense, investigation, settlement, or legal expense covered by the underlying insurance.” ( W SJ 3). Westchester argues that since the court in the Primary Insurers Action found that the Primary Insurers were liable to BASF and were ordered to pay some of the costs of the Synthroid Litigation, Exclusion O bars coverage under 1989-1990 and 1990-1991 Westchester Policies. However, as is indicated above, BASF has pointed to sufficient evidence that shows that Westchester breached its duty to defend Knoll. If an insurer is found to have breached its duty to defend an insured, the insurer is estopped from arguing that the coverage is precluded under policy exclusions. *Employers Ins. of Wausau*, 708

N.E.2d at 1135. If an insurer breaches its duty to defend an insured "the estoppel doctrine has broad application and operates to bar the insurer from raising policy defenses to coverage, even those defenses that may have been successful had the insurer not breached its duty to defend." *Id.*; *see also Elas*, 352 N.E.2d at 62(stating that "[w]hen an insurer unjustifiably refuses to afford a defense for the insured, it is later estopped from raising the defense of non-coverage in a suit against it to enforce a judgment against the insured"). Thus, since there is sufficient evidence that shows that Westchester breached its duty to defend Knoll, Westchester is estopped from arguing that coverage is excluded under Exclusion O.

6. Late Notice - Condition E

Westchester argues that Condition E of the 1989-1990 and 1990-1991 Westchester Policies ("Condition E") required Boots to notify Westchester "as soon as practicable" of any "occurrence" that might result in a claim under the policies. Westchester claims that Knoll delayed giving notice to Westchester of potential claims that would fall within the policies' coverage and that Knoll did not provide such notice until June of 1997. As is indicated above, Westchester is estopped from arguing that coverage is precluded under an exclusion and thus Westchester cannot argue that Condition E precludes coverage. *Employers Ins. of Wausau*, 708 N.E.2d at 1135. Also, as is indicated above, the undisputed facts show that Knoll did attempt to discuss the Synthroid Litigation with its insurers in meetings and

Westchester has not pointed to evidence that would enable a reasonable trier of fact to conclude that Knoll waited for an unreasonable amount of time to notify Westchester. In addition, as is mentioned above, although Westchester now contends that it was not given a timely notice of the Synthroid Litigation and the positions of the Primary Insurers, Westchester admits that its letters denying coverage did not list the alleged untimely notice as a basis for the denial. (WR BSF 81). Therefore, no reasonable trier of fact could find that coverage is barred under the late notice provision of Condition E.

7. Assumption of Liability Without Consent - Condition E

Westchester argues that Condition E of each of the Westchester Policies provided that the insured would not, except at its own cost, "voluntarily make a payment, assume an obligation, or incur any expense . . . ." ( W SJ 3). Westchester argues that Knoll voluntarily chose to make a settlement payment in the Synthroid Litigation and, thus, under Condition E, Westchester has no obligation to compensate BASF for the amount paid by Knoll in the settlement. However, as is indicated above, Westchester is estopped from arguing that coverage is precluded under an exclusion and thus Westchester cannot argue that Condition E precludes coverage. *Employers Ins. of Wausau*, 708 N.E.2d at 1135. In addition, once an insurer wrongfully refuses to defend an insured, the insured is permitted "to negotiate a reasonable settlement." *Maneikis v. St. Paul Ins. Co. of Illinois*, 655 F.2d

818, 827 (7th Cir. 1981). In the instant action, Knoll did not simply make a voluntary payment in the settlement without consulting Westchester and thereby depriving Westchester an opportunity to decide whether such monies should be spent. The undisputed facts in the instant action show that Westchester unequivocally refused to defend Knoll and that after Westchester breached its duty to defend Knoll, Knoll, while putting on its own defense, paid out monies in the settlement. There is no indication that the settlement was unreasonable and Westchester is estopped from arguing that the voluntary payment provision of Condition E precludes coverage.

8. Prior Publication Exclusion

Westchester argues that there is no coverage under the prior publication exclusion in the 1989-1990 and 1990-1991 Westchester Policies. Westchester asserts that the policies included a section ("Prior Publication Exclusion") that provided that coverage will not be provided for a "personal injury" or an "advertising injury" that arose "out of oral or written publication of material whose first publication took place before the beginning of the policy period." (WSJ 6). Westchester argues that the alleged defamatory and disparaging statements were first published on April 1, 1989, which was before the formulation of the Westchester Policies. However, as is indicated above, Westchester is estopped from arguing that coverage is precluded under an exclusion and thus Westchester cannot argue that the

prior publication exclusion precludes coverage. *Employers Ins. of Wausau*, 708 N.E.2d at 1135. Thus, Westchester is estopped from asserting that there was no coverage under the Prior Publication Exclusion.

C. Validity of Assignment

Westchester argues that BASF lacks standing because the assignment of the rights from Knoll to BASF to bring the instant claims was invalid. Westchester contends that BASF purportedly received the assignment from Abbott Laboratories ("Abbott"), the parent of Knoll, but Abbott had no authority to assign the rights held by Knoll. However, Westchester has previously argued this point in Defendants' motion to dismiss. On September 7, 2005, we denied Defendants' motion to dismiss and ruled that BASF has sufficiently established that the assignment was proper and that BASF has standing. Westchester again argues that BASF received the assignment from Abbott rather than Knoll, and that the assignment was thus ineffective. However, this is contrary to Westchester's own statements included in its reply brief in support of Defendants' motion to dismiss, in which Westchester conceded that the assignment was proper. Westchester adopted the statements included in Federal's reply brief, which included the statement that "the Insurers have not disputed that BASF had the right to pursue all insurance claims for policies in excess of those policies disputed in Case No. 00 C 67 33." (W Dis. Reply 4). Westchester thus conceded in its reply brief to the motion to dismiss that the

assignment to BASF was effective and Westchester's only argument in its reply brief regarding the assignment related to the scope of the rights that were assigned to BASF.

The standing issue has already been addressed by this court and Westchester was already given an opportunity to brief the issues concerning standing and the assignment. Westchester has not shown a reason why its current arguments could not have been presented to the court prior to the court's ruling on standing and thus, Westchester is improperly seeking to have the court reconsider its prior ruling. *See Caisse Nationale de Credit Agricole v. CBI Indus.*, 90 F.3d 1264, 1269-70 (7th Cir. 1996)(stating that a motion for reconsideration may be brought "to correct manifest errors of law or fact or to present newly discovered evidence" and that such motions cannot be used as a "vehicle to introduce new evidence that could have been" produced earlier). Also, Westchester is now improperly taking positions contrary to those taken in prior briefings before this court regarding the validity of the assignment, which violates the "mend the hold" doctrine. *See Harbor Ins. Co. v. Continental Bank Corp.*, 922 F.2d 357, 364 (7th Cir. 1990)(stating that the "mend the hold" doctrine "bars a contract party from changing his position in litigation")(emphasis omitted). We also note that, regardless, none of the arguments presented by Westchester in its motion for summary judgment show that the assignment was invalid. Therefore, we deny Westchester's motion for summary judgment to the extent that it is based upon the alleged invalidity of the assignment from Knoll to BASF.

D. Offenses Outside Policy Periods

Westchester argues that, at the very least, it cannot be required to provide coverage relating to conduct that occurred before or after the policy period for the Westchester Policies. Westchester argues that there was publication of materials in April 1989, before the start of the Westchester Policies' coverage periods, and conduct that occurred in 1995, after the conclusion of the policy periods for the Westchester Policies. BASF contends that the claims do fall within the policy periods. The claims in the Synthroid Litigation arose out of statements involving the criticisms of the Dong study that began in 1990, which were within the policy period and BASF has pointed to various other disparaging statements that were a part of the bases of the Synthroid Litigation and which occurred within the policy coverage periods. ( WR BSF Par. 65). In addition, Westchester is estopped from arguing that the incidents that were the bases for the Synthroid Litigation occurred outside the policy period since Westchester breached its duty to defend Knoll. *Employers Ins. of Wausau*, 708 N.E.2d at 1135. Thus, Westchester cannot obtain summary judgment on the basis that the alleged disparaging statements occurred outside the policy period. To the extent that Westchester argues that the damages it owes to BASF should be limited because certain conduct occurred outside the policy periods, such an argument pertains to damages and is premature at this juncture.

E. Allocation

Westchester argues that if it did have a duty to defend Knoll, it still should not be required to pay for the entire settlement. Westchester contends that the settlement failed to differentiate between insured and uninsured parties and that the court must conduct an allocation of the settlement proceeds. Westchester's request for an allocation is premature because it relates to the damages portion of these proceedings, rather than to Westchester's liability to BASF. The motions for summary judgment currently before the court address the issue of whether Westchester is liable to BASF. If the court grants BASF's motion for summary judgment and denies Westchester's motion for summary judgment, these proceedings will need to proceed to the damages phase, at which point the court will address the issue of damages. Therefore, Westchester's request for an allocation is premature at this juncture.

F. Duty to Indemnify

Westchester argues that BASF has not pointed to sufficient evidence that shows that Westchester's duty to indemnify Knoll was triggered. To determine whether an insured had a duty to indemnify an insured, a court should not, as with a duty to defend, examine whether the factual allegations in the underlying action potentially indicate that there is coverage. *Waste Management, Inc.*, 579 N.E.2d at 333. Rather, a duty to indemnify is triggered "only when the insured becomes

legally obligated to pay damages in the underlying action that gives rise to a claim under the policy." *Id.*

In the instant action, Westchester admits pursuant to Local Rule 56.1 that the Synthroid Litigation was initiated. ( WR BSF Par. 38, 43, 49). Westchester admits that the payments made by Knoll in the litigation were settlement payments to resolve the legal claims brought against Knoll. ( WR SF Par. 52). The decision to settle the matter at a relatively early stage was a calculated decision by Knoll to make a payment and to avoid further potential liability. The undisputed facts show that Westchester chose not to participate in the Synthroid Litigation and therefore, it cannot now complain about the actions of Knoll in settling the matter. Knoll agreed to the preliminary settlement and, at that point, Knoll became legally obligated to pay the amounts that Westchester acknowledges exceeded the Primary Policy limits. Westchester therefore had a duty to indemnify Knoll. Accordingly, we deny Westchester's motion for summary judgment to the extent that Westchester seeks a declaration that it owed no duty to indemnify Knoll. We also note that since Westchester admits that it neither sought a judicial declaratory judgment indicating that it owed no duty to indemnify Knoll nor indemnified Knoll under a reservation of rights, Westchester is now estopped from disputing coverage in regard to its duty to indemnify Knoll. *Waste Management, Inc.*, 579 N.E.2d at 335(explaining that the estoppel principle applies to duty to indemnify).

G. Reasonableness of Settlement

Westchester argues that the settlement in the Synthroid Litigation was not reasonable and that Knoll agreed to pay too much money to the plaintiffs in that case. When an insurer refuses to defend an insured, an insured has a right to settle the litigation. However, "the insured has a duty to settle reasonably and in good faith and it bears the burden of proving that the amount of the settlement was reasonable." *United States Gypsum Co. v. Admiral Ins. Co.*, 643 N.E.2d 1226, 1249-50 (Ill. App. Ct. 1994)(stating that "[a] settling insured must show that it 'was responding to a reasonable anticipation of personal liability rather than acting as a mere volunteer'").

In the Synthroid Litigation, the district court has already ruled that the settlement was "fair, reasonable, and adequate." *In re Synthroid Mktg. Lit.*, 110 F.Supp.2d at 680-83. The court noted that "[i]f the plaintiffs won, as they might, the defendants would face even more staggering liabilities than under this settlement agreement." *Id.* at 683. Thus, there has already been a judicial determination regarding the reasonableness of the settlement and Westchester has not pointed to sufficient evidence that shows that the court in the Synthroid Litigation made an error in its finding. BASF has pointed to ample evidence that shows that Knoll faced a massive damages award if the plaintiffs prevailed in the Synthroid Litigation and that the settlement was reasonable. In addition, since Westchester wrongfully refused to offer a defense to Knoll in the Synthroid Litigation, Westchester is estopped from challenging the reasonableness of the settlement.

In summation, based upon all of the above, no reasonable trier of fact could find other than that Westchester breached its duty to defend and indemnify Knoll. Therefore, we grant BASF's motion for summary judgment on the breach of contract and indemnity claims brought against Westchester and deny Westchester's motion for summary judgment on the breach of contract and indemnity claims brought against Westchester.

IV. Section 5/155 Claim Brought Against Westchester

Both BASF and Westchester have moved for summary judgment on the Section 5/155 claim brought against Westchester. BASF argues that Westchester violated Section 5/155 which provides, in part, the following:

> In any action by or against a company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an *unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable*, the court may allow as part of the taxable costs in the action reasonable attorney fees, other costs . . . .

215 ILCS 5/155(1)(emphasis added). Although Section 5/155 provides for fees, the Seventh Circuit has made it clear that attorney's fees "may not be awarded simply because an insurer takes an unsuccessful position in litigation" and can only be awarded "where the evidence shows that the insurer's behavior was willful and without reasonable cause." *Citizens First Nat. Bank of Princeton v. Cincinnati Ins. Co.*, 200 F.3d 1102, 1110 (7th Cir. 2000). An insurer is not deemed to have engaged

in vexations and unreasonable conduct if: "(1) there is a bona fide dispute concerning the scope and application of insurance coverage, . . . (2) the insurer asserts a legitimate policy defense, . . . (3) the claim presents a genuine legal or factual issue regarding coverage, . . . or (4) the insurer takes a reasonable legal position on an unsettled issue of law." *Id.*

In the instant action, Westchester is not deemed liable under Section 5/155 simply because the evidence shows that Westchester wrongfully denied coverage to Knoll. The undisputed facts show that Westchester believed that it had valid arguments concerning the scope of the Westchester Policies' coverage provisions and in regard to various exclusions and conditions in the policies that potentially could have precluded coverage, although its arguments were not meritorious. Even though Westchester is estopped from denying coverage because Westchester did not seek a judicial determination or defend Knoll under a reservation of rights, such inaction by Westchester is not sufficient to show that it acted unreasonably or vexatiously. BASF argues that since the court in the Primary Insurer Action found that the Primary Insurers had wrongfully denied coverage, then Westchester should have also known that it owed coverage to Knoll. BASF contends that Westchester's continued resistance to payment unreasonably forced BASF to incur additional costs in bringing the instant action against Westchester. However, Westchester was not a party in the Primary Insurer Action and although the Primary Policies had provisions similar to the Westchester Policies, the policies were not exactly the same. Westchester had taken a stand years ago in 1997 in refusing to provide coverage to

BASF and there was nothing vexatious or unreasonable in Westchester's refusal to concede its liability after the ruling in the Primary Insurers Action or its request for its day in court to defend its actions. Therefore, we conclude that based on the undisputed evidence in this action, no reasonable trier of fact could find other than that Westchester is not liable for fees and cost under Section 5/155. Therefore, we grant Westchester's motion for summary judgment on the Section 5/155 claim and deny BASF's motion for summary judgment on the Section 5/155 claim brought against Westchester.

V. Breach of Contract and Indemnity Claims Brought Against Great American

BASF and Great American have moved for summary judgment on the breach of contract and indemnity claims brought against Great American. BASF argues that Great American owed Knoll a duty to defend and indemnify Knoll because the Synthroid Litigation arose out of a personal injury and an advertising injury. Great American argues that the Synthroid Litigation did not involve a personal injury or an advertising injury. Great American argues that Knoll did not notify Great American in a timely manner of the Synthroid Litigation. Great American also argues that coverage is excluded under certain provisions of the Great American Policy. Great American also challenges that validity of the assignment from Knoll to BASF and contests BASF's standing in the instant action.

<u>A. Whether Great American is Estopped From Disputing Coverage</u>

______BASF argues that if Great American believed that the Synthroid Litigation was not covered by the Great American Policy, then Great American was obligated to either seek a judicial declaration of non-coverage or defend Knoll under a reservation of rights. As is explained above, an insurer's duty to defend an insured is triggered "when, based on the pleadings, there is a claim that is potentially covered by the insurance agreement." *Waste Management, Inc.*, 579 N.E.2d at 333. As is explained in detail below, BASF has pointed to sufficient undisputed facts that clearly show that Great American breached its obligation to provide coverage to Knoll and offer a defense for Knoll. The estoppel of the insurer "arises at the moment the insurance company wrongfully refuses to defend." *Maneikis*, 655 F.2d at 822. Great American admits pursuant to Local Rule 56.1 that it refused to provide a defense to Knoll in the Synthroid Litigation. ( GR BSF Par. 38). Although Great American argues that its refusal letters were couched in terms that invited additional submissions of information by Knoll regarding the Synthroid Litigation, Great American does not contest that it ultimately provided no defense to Knoll in the Synthroid Litigation. (GR BSF Par. 87). Thus, Great American had an obligation at that time, not to simply rest upon its denial, but to either provide coverage under a reservation of rights or file a declaratory judgment action. Great American has not pointed to any evidence that disputes the showing of the evidence by BASF that Great American failed to take either of the above mentioned required actions. Therefore, the undisputed evidence shows that Great American is estopped from

arguing at this juncture that it owed no coverage to Knoll.

B. Policy Coverage

BASF argues that coverage of the Synthroid Litigation is provided in the terms of the Great American Policy. Great American argues that the Synthroid Litigation is beyond the scope of the coverage in the Great American Policy and that certain provisions in the policy preclude coverage.

1. Personal Injury and Advertising Injury

Great American has not disputed the accuracy of the Great American Policy that provided as an exhibit by BASF and thus we shall refer to the exhibit for the provisions of the policy. The Great American Policy provides the following: "We will pay those sums in excess of 'underlying insurance' or the retained limit that the 'insured' becomes legally obligated to pay as damages because of 'injury' caused by an 'occurrence' to which this policy applies." (BSJ Ex. J). Great American also concedes that, as with the Westchester Policies, the Great American Policy covers a "personal injury" and an "advertising injury." ( GR BSF Par. 23). Great American admits that the Great American Policy defined the term "Personal Injury" to include an "injury, other than 'bodily injury,' arising out of . . .(4) Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services . . . ." ( GR BSF Par. 24). In

addition, Great American admits that the Great American Policy defined the term "Advertising Injury" to include an "injury arising out of . . . (1) Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services . . . ." ( GR BSF Par. 25).

Great American argues that the Synthroid Litigation did not involve a personal injury or an advertising injury. However, the language in the Great American Policy regarding such injuries mirrors the language in the Westchester Policies discussed above. For the same reasons discussed above, we conclude that no reasonable trier of fact could conclude other than that the Synthroid Litigation did involve a personal injury or advertising injury. Thus, no reasonable trier of fact could conclude other than that Great American owed Knoll a duty to defend Knoll in the Synthroid Litigation because the occurrence involved a personal injury or an advertising injury.

2. Exhaustion of Primary Policies

BASF also argues that Great American owed a duty to defend Knoll under the Great American Policy provision that referenced the exhaustion of the Primary Policies ("Exhaustion Provision"). The Great American Policy provides that Great American would provide coverage "[i]n the event of reduction or exhaustion of the aggregate Limits of Insurance of 'underlying insurance . . . .'" (BSJ Ex. J. 001347). As is explained above in regard to the claims brought against Westchester, there is

sufficient evidence that shows that the Primary Policies were exhausted. The undisputed evidence, thus, clearly shows that Great American was obligated to defend Knoll under the Exhaustion Provision.

3. Cooperation Clause

Great American argues that the Great American Policy contained a provision ("Cooperation Clause") that provided that Great American had the right to "associate with" the insured "in the defense and control of any occurrence, claim, or 'suit' that appears likely to involve" the Great American Policy. (GSJ 8). Great American further contends that the Cooperation Clause provided that the insured's primary insurers and the insured would "cooperate with" Great American "in the defense of such occurrence, claim, or 'suit.'" (GSJ 8). Great American argues that it "was not provided with the opportunity to pursue its own investigation and defense" and that the defense by Knoll "resulted in an adverse settlement of over $100 million . . . without Great American's consent." (GSJ 8).

First, since there is sufficient evidence that Great American breached its duty to defend Knoll, Great American is estopped from rasing exclusions to contest coverage. *Employers Ins. of Wausau*, 708 N.E.2d at 1135. Second, Great American admits pursuant to Local Rule 56.1 that its predecessor, Agricultural, was sent a letter by Knoll on June 23, 1997, inviting Agricultural to participate in a meeting at which the Knoll was going to discuss with its insurers the status of the Synthroid

Litigation claims and the possibility of reaching a settlement with the plaintiffs in that case. (GR BSF Par. 85). Great American also admits pursuant to Local Rule 56.1 that Brad Schuler attended a conference on July 8, 1997, regarding the Synthroid Litigation for Boots' insurers and that Brad Schuler was sent to the meeting "on behalf of Great American." (GR BSF Par. 86). Great American also admits pursuant to Local Rule 56.1 that none of Knoll's insurers, which included Great American, provided Knoll with a defense in the Synthroid Litigation. ( GR BSF Par. 38). Thus, the undisputed evidence indicates that Great American was aware of the Synthroid Litigation and had an opportunity to participate in the defense of Knoll, but that Great American refused to do so. Therefore, no reasonable trier of fact could conclude that Knoll violated the Cooperation Clause.

4. Assumption of Liability

Great American argues that a provision of the Great American Policy ("Assumption of Liability Provision") provided that "[n]o 'insured' will, except at their own, voluntarily make a payment, assume any obligation, or incur any expense without our consent." (GSJ 9). However, for the same reasons explained above in regard to arguments made by Westchester, Great American is estopped from pursuing such an argument. Also, as is indicated above, once an insurer wrongfully refuses to defend an insured, the insured is permitted "to negotiate a reasonable settlement." *Maneikis*, 655 F.2d at 827. Thus, no reasonable trier of fact could

conclude that coverage was excluded under the Assumption of Liability Provision.

5. Prior Publication Exclusion

Great American argues that the Great American Policy contained an exclusion comparable to the Prior Publication Exclusions discussed above in the Westchester Policies. For the same reasons discussed above, Great American is estopped from pursuing such an argument. Therefore, no reasonable trier of fact could conclude that coverage was precluded on the exclusion in the Great American Policy that was comparable to the Prior Publication Exclusion in the Westchester Policies. Thus, as discussed above, based on the undisputed evidence, no reasonable trier of fact could conclude other than that BASF has met its burden in showing that Great American owed an obligation to defend Knoll in the Synthroid Ligation.

C. Standing, Policy Period, Allocation, and Indemnity

Great American contests BASF's standing in the instant action, arguing that the assignment from Knoll to BASF was not valid. For the reasons discussed above in regard to the claims brought against Westchester, we conclude that no reasonable trier of fact could find other than that BASF has standing in the instant action. Great American has offered no new arguments that alter the conclusion reached above by the court.

Great American also complains that the Synthroid Litigation is based upon

conduct that occurred outside the policy period. However, as is indicated above in regard to the Westchester Policies, there is sufficient conduct at issue that is within the policy periods. Also, as is indicated above, to the extent that Great American is seeking to limit damages, such an argument is premature at this juncture. Great American also requests an allocation of the settlement. For the reasons discussed above in regard to the claims brought against Westchester, the request for an allocation involves damages and is premature at this juncture. We also note, as is explained above in regard to the indemnity claim brought against Westchester, Great American became obligated to indemnify Knoll when Knoll made the payments for the preliminary settlement in the Synthroid Litigation.

D. Late Notice

Great American argues that Knoll failed to provide Great American with timely notice of the Synthroid Litigation and the positions of Knoll's insurers. However, as is explained above, Great American is estopped from making such an argument since the evidence shows that it breached its duty defend Knoll. Also, Great American admits that it was invited to a meeting and a conference to discuss such matters and the undisputed evidence clearly shows that Knoll provided Great American with timely notice. Therefore, no reasonable trier of fact could conclude that Great American was not provided with timely notice of the Synthroid Litigation and the positions of Knoll's insurers.

Thus, as discussed above, based on the undisputed evidence, no reasonable trier of fact could conclude other than that BASF has met its burden of showing that Great American breached its duty to defend and indemnify Knoll in the Synthroid Litigation. Therefore, we grant BASF's motion for summary judgment on the breach of contract and indemnity claims brought against Great American and deny Great American's motion for summary judgment on the breach of contract and indemnity claims brought against Great American.

VI. Section 5/155 Claim Brought Against Great American

Both BASF and Great American have moved for summary judgment on the Section 5/155 claim brought against Great American. In the instant action, similar to our discussion in regard to the Section 5/155 claim brought against Westchester, Great American is not deemed liable under Section 5/155 simply because the evidence shows that Great American wrongfully denied coverage to Knoll. The undisputed facts show that Great American believed that it had valid arguments concerning the scope of the Great American Policy's coverage provisions and in regard to various exclusions and conditions in the policy that potentially could have precluded coverage, although the arguments were not meritorious. There is insufficient evidence pointed to by BASF that would enable BASF to prevail on its Section 5/155 claim against Great American. Therefore, we grant Great American's motion for summary judgment on the Section 5/155 claim and deny BASF's motion

for summary judgment on the Section 5/155 claim brought against Great American.

VII. Breach of Contract and Indemnity Claims Brought Against Federal

BASF argues that Federal was obligated to defend and indemnify Knoll in the Synthroid Litigation under certain provisions in the Federal Policy. Federal argues that the Synthroid Litigation was beyond the scope of coverage in the Federal Policy and that coverage was precluded for a variety of other reasons.

A. Whether Federal is Estopped From Disputing Coverage

BASF argues that if Federal believed that the Synthroid Litigation was not covered by the Federal Policy, then Federal was obligated to either seek a judicial declaration of non-coverage or to defend Knoll under a reservation of rights. As is explained above, an insurer's duty to defend an insured is triggered "when, based on the pleadings, there is a claim that is potentially covered by the insurance agreement." *Waste Management, Inc.*, 579 N.E.2d at 333. As is explained below, BASF has pointed to sufficient undisputed facts that clearly show that Federal breached its obligation to provide coverage to Knoll and offer a defense for Knoll. The estoppel of the insurer "arises at the moment the insurance company wrongfully refuses to defend." *Maneikis*, 655 F.2d at 822. Federal admits pursuant to Local Rule 56.1 that it refused to provide a defense to Knoll in the Synthroid Litigation. ( FR BSF Par. 93). Although Federal argues that its refusal letter was couched in terms

that invited additional submissions of information by Knoll regarding the Synthroid Litigation, Federal does not contest that it ultimately provided no defense to Knoll in the Synthroid Litigation. (FR BSF Par. 38). Thus, Federal had an obligation at that time to not simply rest upon its denial, but to either provide coverage under a reservation of rights or file a declaratory judgment action. Federal has not pointed to any evidence that disputes the showing by BASF that Federal took neither of the required actions. Therefore, the undisputed evidence shows that Federal is estopped from arguing at this juncture that it owed no coverage to Knoll. ______

B. Coverage Under Federal Policies

Federal admits pursuant to Local Rule 56.1 that it issued a policy to Boots that covered 1993-1994 ("1993-1994 Federal Policy") and a policy that covered 1994-1995 ("1994-1995 Federal Policy"). (FR BSF Par. 30-31). Federal does not dispute that the copies of the Federal Policies that were included as exhibits to BASF's motion for summary judgment are accurate copies of the policies, and therefore we shall refer to those exhibits. The 1993-1994 Federal Policy provides the following:

> 1. We will assume charge of the settlement or defense of any claim or suit against the insured when:
>
> a. the Limits of Liability of the Scheduled Underlying Policies have been exhausted by payment of claims;
>
> b. damages are sought for bodily injury, property damage or advertising injury covered by this policy and to which no Underlying Insurance or other Insurance applies.

(BSJ Ex. K). Federal admits pursuant to Local Rule 56.1 that the 1993-1994 Federal Policy defined the term "personal injury" as an "injury, other than 'bodily injury,' arising out of one or more of the following offenses: . . . Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services . . . ." (FR BSF Par. 32). The 1994-1995 Federal Policy provided coverage "when the applicable limit of underlying insurance has been exhausted by payment of claims," or when "damages are sought for bodily injury, property damages, personal injury or advertising injury to which no underlying insurance or other insurance applies." (BSJ Ex. L. 001411).

Federal admits pursuant to Local Rule 56.1 that the 1994-1995 Federal Policy defined the term "advertising injury" to include an "[o]ral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services . . . ." (FR BSF Par. 31). Federal also admits that the Coverage B Section of the 1994-1995 Federal Policy defines the term "personal injury" as an "injury, other than 'bodily injury,' arising out of one or more of the following offenses: . . . oral or written publication of material that slanders or libels a person or organization . . . ." (FR BSF Par. 33).

1. Bases For Coverage

BASF argues that Federal owed BASF an obligation to defend Knoll because the Synthroid Litigation arose out of a personal injury and an advertising injury.

Federal argues that the Synthroid Litigation did not involve a personal injury or an advertising injury. For the reasons explained above in regard to the other Defendants' policies, we conclude that there is sufficient evidence that shows that the Synthroid Litigation did grow out of a personal injury or an advertising injury. This is still true when we apply the evidence to the specific provisions of the Federal Policies. In addition, the undisputed evidence clearly shows that Federal would be bound by its promise in the 1993-1994 Federal Policy to provide coverage when the Primary Policies were exhausted.

2. Bases for Coverage Exclusion

Federal argues that there are various bases for a preclusion of coverage in the Federal Policies. Federal argues that there was a specific provision in the Federal Policies that was comparable to the Prior Publication Exclusion mentioned above in the Westchester Policies. For the same reasons explained above, Federal is estopped from pursuing such a position. Federal also argues that a provision in the Federal Policies required Knoll to give Federal timely notice of claims and that Knoll did not do so. As is explained above, Federal is estopped from taking such a position since the evidence shows that Federal breached its duty to defend Knoll. In addition, Federal admits pursuant to Local Rule 56.1 that on June 23, 1997, Knoll wrote a letter to Federal notifying Federal of the Synthroid Litigation. ( FR BSF Par. 90). Federal contends that the letter only mentioned three specific cases, but regardless,

Federal was put on notice of the Synthroid Litigation. ( FR BSF Par. 90). Federal also admits that on June 23, 1997, another letter was written to Federal inviting Federal to a meeting to discuss the Synthroid Litigation, the possibility of a settlement, and the insurers' position. ( FR BSF Par. 91). Thus, based on the undisputed evidence, Federal clearly had timely notice of the Synthroid Litigation.

Federal also argues that the settlement violated a provision in the Federal Policies comparable to the Assumption of Liability Provision in the Great American Policy. For the same reasons discussed above, as the evidence applies to Federal, the undisputed evidence shows that Federal is estopped from taking such a position at this juncture. Also, as is explained above in regard to the duty to indemnify for the other Defendants, Federal clearly owed Knoll a duty to indemnify.

C. Standing, Policy Periods, Allocation

Federal argues, as the other Defendants have, that BASF lacks standing to bring the instant action because the assignment from Knoll to BASF was invalid. For all the reasons explained above, we conclude that there is sufficient evidence of standing by BASF and Federal has not presented any new arguments that alter the conclusion reached above by the court. Federal also contends that some of the conduct that was a basis for the Synthroid Litigation was outside the Federal Policies' coverage periods. To the extent that Federal seeks summary judgment on the issue of liability, for the reasons explained above in regard to the other Defendants' policies,

we deny Federal's motion for summary judgment. To the extent that Federal is seeking to limit damages, the argument is premature. Federal also requests an allocation of the settlement in the Synthroid Litigation, which also involves the damages issue and is premature at this juncture. Therefore, we grant BASF's motion for summary judgment on the breach of contract and indemnity claims brought against Federal and deny Federal's motion for summary judgment on the breach of contract and indemnity claims brought against Federal.

VIII. Section 5/155 Claim Brought Against Federal

Both BASF and Federal have moved for summary judgment on the Section 5/155 claim brought against Federal. In the instant action, similar to our discussion in regard to Westchester and Great American, Federal is not deemed liable under Section 5/155 simply because the evidence shows that Federal wrongfully denied coverage to Knoll. The undisputed facts show that Federal believed that it had valid arguments concerning the scope of the Federal Policies' coverage provisions and in regard to various exclusions and conditions in the policies that potentially could have precluded coverage, although its arguments were not meritorious. There is insufficient evidence pointed to by BASF that would enable BASF to prevail on its Section 5/155 claim brought against Federal. Therefore, we grant Federal's motion for summary judgment on the Section 5/155 claim and deny BASF's motion for summary judgment on the Section 5/155 claim brought against

Federal.

## CONCLUSION

Based on the foregoing analysis, we grant BASF's motion for summary judgment on the breach of contract and indemnity claims against Westchester, Great American, and Federal. We also deny the motions for summary judgment brought by Westchester, Great American, and Federal on the breach of contract and indemnity claims. We deny BASF's motion for summary judgment on the Section 5/155 claims against Westchester, Great American, and Federal (Count III). We also grant the motions for summary judgment brought by Westchester, Great American, and Federal on the Section 5/155 claims. We also grant in part and deny in part Defendants' motion to strike BASF's statement of material facts and deny BASF's motion to strike Defendants' statement of material facts. Finally, we deny Defendants' joint motion to strike portions of BASF's reply brief and deny Great American's motion to strike portions of BASF's reply brief as moot.

Samuel Der-Yeghiayan
United States District Court Judge

Dated: May 8, 2006